Thomas P. Parley, J.
Plaintiffs, a group of individuals and a corporation, who hold themselves out to be 11 landscape architects ” and perform certain services with respect to the planning, development and enhancement of land from which they derive their livelihood, have brought this action for a judgment declaring unconstitutional article 148 of the Education Law (§§ 7320-7332; L. 1960, ch. 1082), which purports to license ‘ ‘ landscape architects ’ ’ and to regulate the practice of “ landscape architecture ” in this State. •
Article 148 prohibits, on and after July 1, 1961, not only the practice of landscape architecture, as defined in the statute, but also one’s holding himself out to be a “landscape architect” without a license having first been issued by the Education Department (§ 7321) upon certification by the Board of Examiners established by the statute (§ 7322). A violation thereof is declared to be a misdemeanor, punishable by fine and/or imprisonment (§ 7328).
The statute requires that an examination be given before a candidate may be licensed (§ 7323). Admission to the examination is predicated on the candidate’s possessing a combination of specific academic training and practical experience in landscape architecture (§ 7323, subd. 1) or, in the absence of the formal schooling, additional practical experience of a grade and charac *1025 ter satisfactory to the hoard (§ 7323, subd. 1, par. e). The requirement of an examination, however, could have been dispensed with in the discretion of the board if the candidate had filed an application prior to the effective date of the statute and possessed educational requirements and practical experience of a grade and character acceptable to the board (§ 7323, subd. 3). In addition, there is a blanket prohibition against corporations practicing landscape architecture or obtaining a license therefor (§ 7326, subd. 2).
Five of the individual plaintiffs, each claiming to possess the requisites for licensing, made application to the Board of Examiners for a license. These were subsequently denied on the ground of lack of qualifications and for the additional reason that these individuals lacked the experience for admission to the examination. Shortly thereafter the within action was commenced.
After service of the summons and complaint, defendants moved to dismiss the complaint as insufficient in law under rule 106 of the Rules of Civil Practice. That motion was denied by Mr. Justice Gulotta, who sustained the complaint as sufficient to state a cause of action (35 Misc 2d 608). No appeal was taken from the order entered and defendants served an answer which, in effect, constituted a general denial.
Plaintiffs thereafter moved for summary judgment to which the defendants answered by asserting that plaintiffs were not practicing landscape architects but were, in fact, merely landscape gardeners or landscape contractors. Thus, defendants claimed that plaintiffs did not fall within the scope of the statute, were not aggrieved parties and, consequently, were not entitled to attack the statute’s constitutionality. Mr. Justice Brennan denied the motion for summary judgment (237 N. Y. S. 2d 845) holding that a triable issue had been raised and also rejected plaintiffs’ contention that the findings of Mr. Justice Gulotta regarding the unconstitutionality of the statute constituted the law of the case. The order denying summary judgment was sustained on appeal, without opinion (18 A D 2d 822).
At the trial the evidence disclosed that five of the plaintiffs are college graduates, holding degrees of Bachelor of Science after having majored in horticultural courses at Cornell and Rhode Island Universities. The sixth individual plaintiff, Gusman, lacked a degree but had pursued some institutional courses of instruction. Each of the plaintiffs has been engaged in activities for some time, ranging from 3 to 18 years, as single practioners, as employees of landscape contracting or nursery concerns or governmental units or a combination of the fore *1026 going. Their work has been the designing and execution of landscaping for such projects as apartment houses, schools and the development of residential properties. This type of work was also performed for educational institutions, a restaurant, a public museum, and a religious institution. Their activities, however, which included ‘ ‘ anything dealing with the exterior development of the property ”, dealt primarily with residential properties. This, they testified, included consultation, investigation, selection of construction sites, planning and selection of shrubbery and trees and supervision of the consequent development and aesthetic enhancement of the landscape. In addition, these operations, which would be equally applicable to residential, commercial and industrial sites, also included the design of pools, retaining walls, grading, foot paths, parking areas, the installation of sod work and planting and drainage facilities.
Among the exhibits offered by plaintiffs are their business letterheads which title them as “ landscape architect ”. In addition, plans and drawings prepared by them or under their supervision were received in evidence which reveal elaborate and artistic designs for the development of various landscapes. The seventh defendant, Cornell Landscape Service, Inc., is a domestic corporation which sells used railroad ties and constructs retaining walls made from railroad ties.
Defendants called as witnesses two individuals licensed by this State as landscape architects, one a recognized leader in the profession and another a college professor of landscape architecture. The third witness was a civil engineer who has been engaged in many projects with landscape architects. Their testimony, which is considered in more detail later in this memorandum, generally outlines the responsibilities and activities of the landscape architect.
The pertinent parts of the statute on which plaintiffs focus their attack are as follows:
Section 7320:
“ 2. ‘ Landscape architect ’ means a person who engages in the practice of landscape architecture as hereinafter defined.
“ 3. A person practices landscape architecture within the meaning and intent of this article who performs professional services such as consultation, investigation, reconnaissance, research, planning, design, or responsible supervision in connection with the development of land areas where, and to the extent that the dominant purpose of such services is the preservation, enhancement or determination of proper land uses, natural land features, ground cover and planting, naturalistic *1027 and aesthetic values, the settings and approaches to structures or other improvements, natural drainage and the consideration and determination of inherent problems of the land relating to erosion, wear and tear, blight or other hazards.”
Section 7326:
“ 1. This article shall not be construed * * * to apply to the business conducted in this state by any agriculturist, horticulturist, tree expert, arborist, forester, nurseryman or landscape nurseryman, gardner, landscape gardener, landscape contractor, garden or lawn caretaker or grader or cultivator of land, as these terms are generally used, except that no such person shall use the designation landscape architect, landscape architectural or landscape architecture unless licensed under the provisions of this article.”
At the outset, the court finds from the testimony and other evidence offered by the plaintiffs, that a justiciable controversy exists (National Psychological Assn. v. University of State of N. Y., 8 N Y 2d 197) and that the plaintiffs not only hold themselves out to be landscape architects but also perform the work included in the definition of that calling as contained in the statute. They are, consequently, aggrieved parties and proper persons to bring this action (Massachusetts v. Mellon, 262 U. S. 447, 488). A description of the activities in which the plaintiffs are engaged clearly indicates that a declaration of their rights under article 148 is essential to their continuance of the activities from which they derive their livelihood.
Plaintiffs’ initial basis of attack on this law is that the discretion vested in the Board of Examiners under section 7323 to grant or refuse admission to a licensing examination and to grant or deny an application for a license constitutes an unlawful delegation of legislative authority, contrary to the State Constitution (art. in, § 1). The various subdivisions of section 7323 which prescribe the .standards to be met in licensing are replete with phrases like “ of a grade and character satisfactory to the board” and “grade and character acceptable to the board ”.
The Attorney-General insists that the validity of this delegation has been sustained by prior decision, specifically, Bowen v. City of Schenectady (136 Misc. 307, affd. 231 App. Div. 779) wherein the constitutionality of the statute (Education Law, art. 56; L. 1929, ch. 572) which licensed “ architects ” was upheld. Since section 7323 of the statute, which deals with examinations for landscape architects, is substantially similar to that prescribing examinations for architects, he contends that the rationale of the Bowen case is equally applicable here. While *1028 it is true that the court in Bowen sustained the legislation, the constitutional issue of the delegation of legislative power was not raised or passed upon. Consequently, Bowen cannot be considered as determinative of the issue at hand.
Plaintiffs, on the other hand, contend that this licensing standard is just the sort of legislative action which was decried in Matter of Seigmous v. Rice (273 N. Y. 44). The issue in that case did not attack the discretion of an administration official to formulate the standards which a license applicant must meet. Bather, in that case the Legislature had left it to the bare discretion of the administrative official, alone, to determine whether an examination should be required in each particular case and had failed to set any standards on which the official should base his decision. As the court pointed out (p. 50): “The Legislature may delegate to the administrative officer who has been given control of the granting of licenses a measure of discretion in the formulation of tests for the determination of fitness of applicants for a license. (Douglas v. Noble, 261 U. S. 165; Matter of Elite Dairy Products, Inc., v. Ten Eyck, 271 N. Y. 486.) The Legislature cannot grant to an administrative officer plenary power to discriminate between applicants, requiring some to prove their fitness and granting a license to others without such proof. The Legislature is free to choose among conflicting considerations, and mould the law according to its own will subject only to constitutional restrictions. It cannot delegate the same freedom of choice to an administrative officer. There it must erect guide posts which will enable the officer to carry out the will of the Legislature. ” In the instant case, the Legislature has specifically defined the cases in which the board is to exercise its discretion and what factors are to be considered.
A similar situation was recently presented in National Psychological Assn. v. University of State of N. Y. (8 N Y 2d 197) where the court was called upon to determine the constitutionality of a statute requiring certification of “ psychologists ”. In that case the aggrieved parties asserted an unlawful delegation of legislative power by virtue of the Board of Examiners’ being vested with power to determine the “ substantial equivalent ” of a doctoral degree, as well as what constituted “ satisfactory supervised experience ”. The court declared (p. 204): “ That the Legislature assigned to respondent the task of implementing the statute — by recognizing accredited psychology courses in the graduate currículums of charted institutions, by determining the scope of the qualifying examination, by fixing the ‘ substantial equivalent ’ of a doctoral degree, and by deciding what constitutes ‘ satisfactory supervised experience ’— *1029 does not constitute an invalid delegation of legislative power (Matter of Marburg v. Cole, 286 N. Y. 202, 211-212; Matter of City of Utica v. Water Pollution Control Bd., 5 N Y 2d 164). The statute prescribes clearly discernible standards to govern the exercise of the power of certification, and it was 1 proper and fitting for the Legislature to assign broad functions to the Board, particularly when it was contemplated and understood that its members were to bring to their work a familiarity with conditions which the individual legislators could not be expected to possess'.’ (Matter of City of Utica v. Water Pollution Control Bd., supra, p. 170.) ”
The statute in this case provides a similarly comprehensible guide from the Legislature for the Board of Examiners and, hence, is constitutional in that respect. .
Plaintiffs also contend that article 148 of the Education Law is unconstitutional as violative of both the State (N. Y. Const., art. I, § 6) and Federal (U. S. Const., 14th Arndt., § 1) constitutional protections against the deprivation of property without due process of law, in that it deprives the plaintiffs of the right to continue the practice of landscape architecture to which they claim a vested right. The legislation under attack was purportedly enacted pursuant to the State’s police power in the interest of safeguarding life, health and property (Education Law, § 7321).
The State may establish regulations reasonably necessary to secure the general welfare of the community by the exercise of its police power, although the rights of private property are thereby curtailed (People ex rel. Durham R. Corp. v. La Petra, 230 N. Y. 429), and it is not an effective argument against such legislation, if otherwise valid, that it limits the use and may depreciate the value of the plaintiffs’ property. Such frequently is the effect of police regulation and the general welfare of the public is superior in importance to the pecuniary profits of the individual (Matter of Wulfsohn v. Burden, 241 N. Y. 288).
Commenting on this power of the State, the Court of Appeals observed in People v. New York Carbonic Acid Gas Co. (196 N. Y. 421, 436): “ It is quite within a reasonable exercise of the police power to regulate such rights; for all property is held subject to the power of the state to regulate, or control, its use, in order to secure the general safety, or the general welfare. (Bertholf v. O’Reilly, 74 N. Y. 509, 521.) ‘ Every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their prop *1030 erty, nor injurious to the rights of the community.’ (Per Shaw, O. J., in Commonwealth v. Alger, 7 Cush. 84.) Under our system of government, the power to bind all by reasonable measures, looking to the regulation and security of those rights, must reside with the legislature. Its exercise of power, in such respects, is subject to the supervision of the courts and where it can be seen that the legislation is sane and reasonably necessary, neither arbitrary, nor unduly oppressive, it will be upheld.”
That view of the Legislature’s power is applicable to the licensing and regulation of businesses, occupations and other callings. (Hauser v. North British & Mercantile Ins. Co., 206 N. Y. 455.) The evil attacked by the court in the Hauser case was the arbitrary limitation and conditions placed upon the right of individuals to receive commissions as agents for insurance companies. Here such an evil is absent. The provisions of article 148, establishing uniform standards for licensing and examination, meet the equal protection test of ‘ ‘ equality of opportunity to all in like circumstances ” and are not arbitrary or discriminatory against persons “without a basis in reason”. (Hauser v. North British & Mercantile Ins. Co., supra, p. 462.)
In addition, the statute permits licensing of long-established practitioners, without the requirement of an examination, if their practice has been “ of a grade and character acceptable to the board ” (§ 7323, subd. 3). The inclusion of such a provision is a long-standing practice of the Legislature in the enactment of licensing statutes (cf. Matter of Hauser v. Wilson, 2 A D 2d 427; Matter of Turcot, 286 App. Div. 928) and provides additional protection for one’s vested rights.
Two final issues, raised by the plaintiffs in their attack on the validity of article 148, remain to be determined: (1) do the interests of public health, safety and welfare require the policing of the activities performed by a “landscape architect”; and (2) is the statute, defining the regulated activities, sufficiently clear to apprise the public as to what acts are proscribed? Each of these questions depends for its answer on a determination of just exactly what activities are prohibited by the legislation.
Subdivision 3 of section 7320 of the Education Law defines the activities of one engaged in landscape architecture as: “ consultation, investigation, reconnaissance, research, planning, design, or responsible supervision in connection with the development of land areas where, and to the extent that the dominant purpose of such services is the preservation, enhancement or determination of proper land uses, natural land features, ground cover and planting, naturalistic and aesthetic values, the settings and approaches to structures or other *1031 improvements, natural drainage and the consideration and determination of inherent problems of the land relating to erosion, wear and tear, blight or other hazards.” This definition standing alone would describe too broad a field for invasion by the Legislature under the banner of the police power. In an apparent effort, however, to limit the scope of an otherwise too broad prohibition, the Legislature enacted section 7326 which provides, in part, that article 148 “ shall not be construed to affect or prevent * * # the business conducted in this state by any agriculturist, horticulturist, tree expert, arborist, forester, nurseryman or landscape nurseryman, gardener, landscape gardener, landscape contractor, garden or lawn caretaker or grader or cultivator of land, as these terms are generally used, except that no such person shall use the designation landscape architect, landscape architectural or landscape architecture unless licensed under the provisions of this article.”
Plaintiffs contend that when sections 7320 and 7326 are read together, an incomprehensible rule results and no clear guide is furnished by the statute. The Attorney-General, however, contends that 11 a clear and understandable rule of conduct ’ ’ has been formulated thereby in that 1 ‘ the occupations enunciated in section 7326 are excluded from the operation of Article 148 except insofar as those engaged in them hold themselves out as landscape architects ”. He urges that the meanings of the terms describing the various callings which are exempted under section 7326 are well recognized and that “where the meanings of terms employed in the statute have long been recognized in law and life, they will be considered sufficiently definite ”, citing Bellows v. Merchants Desp. Transp. Co. (257 App. Div. 15, affd. 283 N. Y. 581).
No evidence was offered at the trial to define or describe the practices included within the businesses exempted by the statute and, hence, there is nothing in the trial record to guide the court in amplifying the meaning of “as these terms are generally used ”.
Landscape architecture has been recognized in this State (Matter of Geiffert v. Mealey, 293 N. Y. 583) and elsewhere (cf. Louisiana v. McIlhenny, 201 La. 78; California, West’s Ann. Business and Professions Code, § 5615 et seq.; Oregon Bev. Stat., tit. 52, § 671.310 ; Georgia Code Ann., §§ 84-4001-84-4019; Louisiana Bev. Stat., tit. 37, ch. 22, § 1961) as a profession embracing a field of highly technical and specialized knowledge and activities “ between the professions of architecture and engineering ” (Matter of Geiffert v. Mealey, supra, p. 585). Such a determination “is in line with the necessity *1032 for recognizing in the law, as in our universities, new professions which have been called into being to take care of modern requirements of our expanding civilization” (Matter of Geiffert v. Mealey, supra, p. 587). A great many universities and colleges throughout the country now offer formal courses leading to degrees in landscape architecture. Implicit in the term ‘1 professional ” is knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study (People ex rel. Tower v. State Tax Comm., 282 N. Y. 407, 412).
Webster’s New International Dictionary (3d ed., Springfield, Mass., Q. & C. Merriam Co.) defines a landscape architect as “ one whose profession is to arrange and modify the effects of natural scenery over a tract of land so as to produce the best aesthetic effect with regard to the use to which the tract is to be put ’ ’.
Turning then to the specifically excepted businesses and pursuits, a further resort to Webster’s indicates that little confusion could result from excluding such activities as those engaged in by an agriculturist, horticulturist, tree expert, arborist, forester, nurseryman, gardener, garden or lawn caretaker, or grader or cultivator of land “ as these terms are generally used ”. The agriculturist, horticulturist and nurseryman, are concerned with the cultivation of soil and planting for the purpose of producing food, flowers, and ornamental plants for sale or use at a site separate and apart from that at which he conducts the operations of his calling. The arborist, forester and tree expert are concerned with the specialty of planting and caring for trees in their various stages of development, either on large tracts of woodland or in more limited surroundings. The grader or cultivator of land is one limited to the actual, physical excavating or tilling of land surfaces. The gardener is “ one employed to care for the gardens or grounds about a home, business concern, or other property ”, suggesting his capacity as being one of maintenance of an already-existing and designed land area. An even more restricted scope of activity is allocated to the 11 garden or lawn caretaker ’ ’.
Considering next the terms “ landscape nurseryman ”,“ landscape gardener ” and “ landscape contractor ”, a “ landscape ” is defined by Mr. Webster as being “ a portion of land or territory that the eye can comprehend in a single view including all the objects so seen”. Thus, when “ landscape ” is used to modify or describe the acts of a nurseryman, gardener or contractor, it suggests that these activities are adapted to a large-scale area of land. Applying this standard then to the *1033 nurseryman and gardener, it becomes clear that a landscape nurseryman is ‘ ‘ one whose occupation is the scientific cultivation of trees, shrubs, and plants ” on a large scale or for a large project.
The term “landscape contractor ” presents little difficulty. A “ contractor” is a person who enters into a contract with the owner of real property for the improvement thereof and is responsible for the materials furnished or the labor performed (Russell v. Pichler, 206 App. Div. 651, opinion in 198 N. Y. S. 702). Mr. Webster indicates that a contractor is “ one who contracts on predetermined terms to provide labor and materials and to be responsible for the performance of a construction job in accordance with established specifications or plans ”. Thus it would appear that the landscape contractor is not engaged in the planning or designing of the landscape but, rather, is the one who carries out and executes the previously determined design pursuant to his contract with the owner.
Webster describes the activities of “landscape gardener” as ‘ ‘ one who is skilled in the development and decorative planting of gardens and grounds ’ ’. While these activities may come close to the traditional realm of the landscape architect, the gardener, as cited above, is primarily concerned with the care and maintenance of already existing installations and the landscape gardener, while requiring greater knowledge and expertise, remains basically one who cares for and attends already developed areas. On the other hand, the defendants’ witnesses described the role of the landscape architect as including consultation, designing and planning of new projects according to the wishes and resources of a client. While he might supervise the subsequent execution of those plans, he furnished neither the labor nor the supplies for any project.
Thus, it is reasonable to conclude from the testimony at the trial and from an examination of the authorities that the activities sought to be regulated by article 148 of the Education Law are those which are restricted to the furnishing of trained professional services for consultation, research, planning, design, etc., for the development, preservation and enhancement of land, as distinguished from the furnishing of the labor, equipment, or supplies whereby the development of land areas are to be realized.
Does this analysis of the statute stand the test of constitutionality? If this standard is to be subject to attack as violative of due process, it is not the criminal penalty which is challenged as invalid, but rather the exaction of obedience to a rule or standard which is so vague and indefinite as really to be no *1034 rule or standard at all (Small Co. v. American Sugar Refining Co., 267 U. S. 233, 239).
The test of vagueness is ‘1 whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices ”. (Jordan v. De George, 341 U. S. 223, 231-232.) Criminal statutes which are likely to affect the general public, such as those concerning the operation of motor vehicles (e.g., Vehicle and Traffic Law, former § 56) have been declared unconstitutional (People v. Firth, 3 N Y 2d 472) as not clear and specific enough to meet the requirements that “ Statutes which create crimes must be definite in specifying conduct which is condemned or prohibited ” and, further, that “ They must afford some comprehensible guide, rule or information as to what must be done and what must be avoided, to the end that the ordinary member of society may know how to comply with its requirements ” (People v. Caswell-Massey Co., 6 N Y 2d 497, 501).
Vagueness, in this case, however, is not tested by how the man in the street or member of the general public would interpret the language of article 148. Bather, the test is how those persons directly affected thereby or familiar with the particular field which is being regulated would be likely to interpret it (Hygrade Provision Co. v. Sherman, 266 U. S. 497, 502; Omaechevarria v. Idaho, 246 U. S. 343, 348). As the Supreme Court of the United States .stated in Cline v. Frink Dairy Co. (274 U. S. 445, 449) with regard to the standard of a criminal statute, the words or phrases used, in order to comply with the constitutional standard of clarity, may have “ a technical or other special meaning, well enough known to enable those within their reach to correctly apply them (Hygrade Provision Co. v. Sherman, 266 U. S. 497, 502; Omaechevarria v. Idaho, 246 U. S. 343, 348) or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ ”.
In determining what construction is to be placed on the térms used in this statute, there is no great body of precedence on the civil side, coupled with familiar practice, which makes it comparatively easy for common sense to keep to what is safe, as courts have found in construing such terms as “ fairly ” (People v. Mancuso, 255 N. Y. 463) or “moral turpitude” (Jordan v. De George, 341 U. S. 223, supra). Yet, the law is full of instances where a man’s fate depends on his estimating correctly as to some matter of degree (Nash v. United States, 229 U. S. 373, 377). While the precise course of the line separating the innocent from the criminal may be uncertain, no *1035 one can consciously approach it without knowledge that he does so; and the criminal law countenances that if he does so, he assumes the risk of possible criminal prosecution (United States v. Wurzbach, 280 U. S. 396, 399).
When the prohibitions of section 7320 are read in conjunction with the exceptions contained in section 7326, a sufficiently clear standard of conduct is set forth to give fair notice to one concerned with or engaged in the activities regulated as to what acts are criminal and those which are innocent. In view of the above, plaintiffs’ challenge on the grounds that the statute is a denial of due process as being vague and uncertain, is without merit.
The final question to which the court must direct its attention is this: Do the interests of public health, safety and welfare require the regulation of the activities performed by a “ landscape architect ” ? Is article 148 of the Education Law on the constitutional side of that borderline beyond which legislation ceases to be within the powers conferred by the People of the State upon its Legislature? (People ex rel. Nechamcus v. Warden, 144 N. Y. 529.)
It is generally for the Legislature to determine what laws and regulations are needed to protect the public health and serve the public comfort and safety, and if its measures are calculated, intended, convenient or appropriate to accomplish such ends, the exercise of its discretion is not the subject of judicial review. (People v. Gillson, 109 N. Y. 389.) The police power is not without limitations, however, and in its exercise the Legislature must respect the great fundamental rights guaranteed by the Constitution. (Matter of Jacobs, 98 N. Y. 98, 110.)
The law recognizes a presumption in favor of the validity of' statutes (Lincoln Bldg. Assoc, v. Barr, 1 N Y 2d 413, 415) and State courts should be clearly convinced that a statute is unconstitutional before they declare it invalid (People v. Nebbia, 262 N. Y. 259, 271). Questions as to wisdom, need or appropriateness are for the Legislature. (Olsen v. Nebraska, 313 U. S. 236, 246; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537.) Conversely, the Legislature will not be sustained in its acts when it seeks to regulate a broad field of activity, which is innocent in itself, merely because it is sometimes done improperly, sometimes attended by improper motives or done as part of an illegal scheme. (People v. Bunis, 9 N Y 2d 1.)
The liberty of pursuit, the right to follow any of the ordinary callings of life, is one of the privileges of citizens of the United States of which he cannot be deprived without invading his right to liberty within the meaning of the Constitution (Matter *1036 of Jacobs, supra). This liberty, however, may be infringed on by the Legislature in the exercise of its police power if it is reasonably necessary for the common welfare or fairly tends in that direction. (People v. Gillson, supra, p. 400.)
The system of certifying certain craftsmen and professionals who meet specific standards has long been recognized as a reasonable exercise of the police power (Berkowitz v. Wilson, 118 N. Y. S. 2d 291, affd. 282 App. Div. 875, affd. 307 N. Y. 851). In many cases the individual must sacrifice his particular interests or desires, if the sacrifice is a necessary one in order that organized society as a whole shall be benefited. The Legislature, however, is not authorized to enact measures which, under the mere guise of a protection to the citizen, restrain him in the free pursuit of a lawful occupation (People ex rel. Nechamcus v. Warden, supra). Such legislation has on occasion been stricken down as unconstitutional where the public health is merely 1 ‘ used as a pretext to aid one group in the community in the competitive race against another or to confer a monopoly in the sale of products ” (Loblaw, Inc., v. New York State Bd. of Pharmacy, 11 N Y 2d 102, 107).
Witnesses produced by the defendants outlined the duties and responsibilities of the professional landscape architect. Gilmore D. Clarke, one who has had many years in this profession, testified that while matters of aesthetics are the primary area in which the landscape architect is involved, he must also concern himself with safety and health. In the course of designing a roadway, a building project, or any other plan of development of real estate, his principal concern is to effect a design which will preserve the character of the surrounding terrain by adapting the improvements to the natural setting. In this respect, the landscape architect is consulted for the purpose of determining the general location and alignment of a road, a consideration necessary to safety as well as aesthetics. And while the principles of parkway development are aesthetic factors which have been carried out through the years, the preservation of terrain and plainting of sides contribute, as well, to the safety of roads. For example, a curvilinear road, basic to the landscape architect’s planning, not only is more aesthetically desirable, but also contributes substantially to the safety of the road.
In road building as well as other phases of the landscape architect’s activities, consultation is had with both civil engineers and architects in their collaboration to effect safe roads. Emil H. Praeger, a licensed civil engineer, testified that the *1037 design of roadways and cloverleafs “ requires both a knowledge of science and an appreciation of art ’ ’ and depends on the knowledge and direction of a landscape architect. The design of safe highways also includes considerations of elevations of opposite lines of traffic, another realm for the landscape architect’s activity. In addition, basic to the proper design of highways is the consideration of proper drainage. It is for the landscape architect to locate catch basins and other drainage devices by adapting them to the surrounding area. The consequences of improper drainage may be flooding of the roadway and surrounding areas, thus critically affecting the safety and health of the users of such highway.
In the course of the design of industrial sites, the landscape architect is consulted on matters of drainage, road alignment and grading. In the development of housing projects, the landscape architect is consulted for the purpose of providing an over-all natural appearance of the buildings in their location and to provide proper drainage. Professor Bradford Sears, professor of landscape architecture at State University, College of Forestry, at Syracuse, New York, stated that “improper grading could lead to deficiencies such as failure in foundation structures, hazard points from the collection of water, changing the physical characteristics of the soil by reason of leaching, producing erosion problems, endangering adjacent property from diversion of natural drainage ’ ’.
There can no longer be any dispute that aesthetics is a valid subject of legislative concern and reasonable legislation designed to promote that end is a valid and permissible exercise of the police power (People v. Stover, 12 N Y 2d 462, 467). This court does not believe that the restrictions imposed by article 148 of the Education Law present either an arbitrary or irrational method of achieving this proper legislative goal.
Not only is the statute a proper subject of the police power for aesthetic reasons, but the landscape architect is directly responsible for matters concerning the health and safety of the community (People v. Bunis, 9 N Y 2d 1, supra). The court can take judicial notice of the myriad of consequences which may flow from improper drainage and the flooding of structures and roadways.
"While it may be that certain activities of those who are required by this legislation to be licensed and regulated by the State do not touch upon the health, safety and welfare of the community, such is not the concern of the courts. Since the Legislature has the authority to act in this field, its wisdom *1038 is not to be challenged in this forum (United States v. Carolene Prods. Co., 304 U. S. 144, 154; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, supra).
Consequently, the court finds that article 148 of the Education Law, as enacted by chapter 1082 of the Laws of 1960, is valid under both the Federal and State Constitutions as a proper exercise of the police power of the State, that it provides a reasonably comprehensible guide to the public, that it does not constitute an unlawful delegation of legislative authority and that it does not deprive the plaintiffs of property without due process of law. In light of the foregoing, the complaint is dismissed and judgment is granted in favor of defendants.